1   JONATHAN COHEN, DC Bar No. 483454
    jcohen2@ftc.gov
2   MICHELLE L. SCHAEFER, DC Bar No. 478773
    mschaefer@ftc.gov
3   AMANDA B. KOSTNER, CA Bar No. 245345
    akostner@ftc.gov
4   SANGJOON "SIMON" HAN, DC Bar No. 998971
    shan@ftc.gov
5   MEGAN A. BARTLEY, VA Bar No. 81840
    mbartley@ftc.gov
6   Federal Trade Commission
    600 Pennsylvania Avenue NW, CC-9528
7   Washington, DC 20580
    (202) 326-2551 (Cohen); -3515 (Schaefer); -2880 (Kostner); -2495 (Han); -3424 (Bartley)
8   (202) 326-3197 (fax)

9   Attorneys for Plaintiff
    Federal Trade Commission

10

11

12                              UNITED STATES DISTRICT COURT
                              NORTHERN DISTRICT OF CALIFORNIA
13                                SAN FRANCISCO DIVISION

14

15   FEDERAL TRADE COMMISSION,                    Case No. _____

16          Plaintiff,                            COMPLAINT FOR PERMANENT
                                                  INJUNCTION AND OTHER
17          v.                                    EQUITABLE RELIEF

18
     VOLKSWAGEN GROUP OF AMERICA, INC.,
19   a corporation, also d/b/a VOLKSWAGEN OF
     AMERICA, INC., also d/b/a AUDI OF
20   AMERICA, INC.

21          Defendant.

22

23

24          Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

25          1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission

26   Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission, restitution,

1    the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for

2    Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in

3    connection with Defendant's false advertising that its "Clean Diesel" vehicles had low

4    emissions, complied with state and federal emissions standards, were environmentally friendly,

5    and retained a high resale value.

6                                                   **JURISDICTION**

7         2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a),

8    and 1345, and 15 U.S.C. § 45(a).

9                         **VENUE AND INTRADISTRICT ASSIGNMENT**

10        3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1)-(2) and (c)(2), and

11   15 U.S.C. § 53(b).

12        4.      Intradistrict assignment to the San Francisco Division is proper pursuant to Civil

13   Local Rule 3-2(c) because acts or omissions giving rise to the FTC's claims occurred, among

14   other places, in San Francisco County, California.

15                                                   **PLAINTIFF**

16        5.      The FTC is an independent agency of the United States Government created by

17   statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a),

18   which prohibits unfair or deceptive acts or practices in or affecting commerce.

19        6.      The FTC is authorized to initiate federal district court proceedings, by its own

20   attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be

21   appropriate in each case, including rescission or reformation of contracts, restitution, the refund

22   of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A).

23                                                   **DEFENDANT**

24        7.      Defendant Volkswagen Group of America, Inc. ("Volkswagen USA") is a New

25   Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive,

26

Complaint                                            2
FTC v. Volkswagen USA

1  Herndon, VA 20171.  Volkswagen USA transacts or has transacted business in this district and

2  throughout the United States.

3        8.      Volkswagen USA also transacts or has transacted business in this district and

4  throughout the United States as Volkswagen of America, Inc. and Audi of America, Inc.,

5  fictitious business names registered in Ohio.

6        9.      Volkswagen USA is a subsidiary of Volkswagen AG, with headquarters in

7  Wolfsburg, Germany.

8        10.     At all times material to this Complaint, acting alone or in concert with others,

9  Volkswagen USA has advertised, marketed, offered for sale, sold, offered for lease, leased, and

10  distributed motor vehicles to consumers throughout the United States, including various makes

11  and models of diesel vehicles marketed as "Clean Diesel" (collectively, "Defeat Device

12  Vehicles," or "DDVs").  Each of these vehicles contains a defeat device, illegal software

13  designed to enable the vehicle to cheat emissions tests.  The defeat device operates when

14  emissions testing occurs and calibrates the emission control system to reduce NOx emissions to

15  legally-compliant levels for the duration of the test.  After testing, the software resumes its

16  default mode:  calibrating the emission control system to allow NOx emissions at as much as

17  4,000 percent above the legal limit, which enables more powerful and durable engine

18  performance.  Without sophisticated testing equipment, there is no way to know whether a

19  vehicle contains such a defeat device.

20                                    **COMMERCE**

21        11.     At all times material to this Complaint, Defendant has maintained a substantial

22  course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

23  15 U.S.C. § 44.

24                       **DEFENDANT'S BUSINESS ACTIVITIES**

25        12.     Defendant Volkswagen USA sells Volkswagen and Audi vehicles through

26  approximately 1,000 dealers and independent distributors throughout the United States.

1    13.    From late 2008 to late 2015, Defendant Volkswagen USA advertised, marketed,

2    offered for sale, sold, offered for lease, leased, and distributed more than 550,000 Defeat Device

3    Vehicles to consumers throughout the United States.

4    14.    Volkswagen USA represented that DDVs had low emissions, complied with

5    government emissions standards, were environmentally friendly, and retained a high resale

6    value.  During this time, Volkswagen USA became the largest seller of light-duty diesel vehicles

7    in the United States.  The DDVs had Manufacturer's Suggested Retail Prices ("MSRPs") ranging

8    from approximately $22,000 for the least expensive Volkswagen-branded 2.0L DDV to

9    approximately $125,000 for the most-expensive Audi-branded 3.0L DDV.  Collectively,

10   consumers spent billions purchasing or leasing Defendant's DDVs.

11   **Volkswagen USA Sold Defeat Device Vehicles.**

12   15.    Nitrogen oxides ("NOx") are a group of dangerous atmospheric pollutants that

13   contribute to a host of harms to the environment and human health, including smog, acid rain,

14   water quality deterioration, childhood asthma, other respiratory ailments, and premature death.

15   16.    To reduce these risks to the American public, the Environmental Protection

16   Agency ("EPA") promulgated NOx emissions limits.  In 2007, the EPA fully implemented these

17   limits for light-duty vehicles, which include passenger cars and SUVs.

18   17.    To ensure that auto manufacturers comply with its emissions standards, EPA

19   administers an emissions certification program, which requires auto manufacturers to apply for a

20   Certificate of Conformity ("COC") for each model and model year.  It is illegal to sell a vehicle

21   without a valid COC.

22   18.    To obtain a COC, a manufacturer must submit an application to EPA's Office of

23   Transportation and Air Quality ("OTAQ"), which includes, among other things, the

24   manufacturer's emissions and durability test results.  OTAQ reviews the test results, and in some

25   cases, it performs "confirmatory testing" to validate the manufacturer's results.  When a

26   manufacturer submits a COC application for a vehicle with a new engine design, OTAQ always

Complaint                                      4
FTC v. Volkswagen USA

1   performs confirmatory testing.  OTAQ's confirmatory testing involves operating the vehicle in a

2   laboratory setting; it does not involve "on-road" testing.  Volkswagen knew how and when

3   OTAQ would perform confirmatory testing.

4         19.     In June 2008, Volkswagen submitted a COC application to OTAQ for its first

5   diesel car in the U.S. market, the 2009 Turbocharged Direct Injection ("TDI") Jetta.  When

6   OTAQ performed confirmatory testing on the TDI Jetta, it passed solely because it contained

7   illegal software designed to defeat EPA's testing procedures (*i.e.*, a "defeat device").

8         20.     Volkswagen began distributing its first Defeat Device Vehicle, the "Clean Diesel"

9   TDI Jetta, in late 2008.  According to Volkswagen USA, its introduction of its new "Clean

10  Diesel" technology in the U.S. market was "proof of [Volkswagen] Group's commitment to

11  provide customers an alternative in their purchase of fuel efficient, clean emissions vehicles that

12  are also fun to drive."

13        21.     Over the next seven years, Volkswagen USA sold, leased, or distributed more

14  than 550,000 Defeat Device Vehicles, which have contributed—and will continue to

15  contribute—to environmental and human health harms including smog, acid rain, water quality

16  deterioration, childhood asthma, adult respiratory ailments, and premature death.

17               **Volkswagen USA Promoted Its Defeat Device Vehicles As "Clean Diesel."**

18        22.     To induce American consumers to purchase its Defeat Device Vehicles,

19  Volkswagen USA spent tens of millions of dollars on widely-disseminated advertising to convey

20  "diesel's environmental and economic advantages."

21        23.     Volkswagen USA targeted much of its "Clean Diesel" advertising at

22  "progressive" and "environmentally-conscious" consumers.  Volkswagen USA's marketers

23  studied their targets' psychology, concluding that such consumers "rationalize themselves out of

24  their aspirations and justify buying lesser cars under the guise of being responsible."  According

25  to Volkswagen USA, such consumers understood purchasing an eco-conscious vehicle as part of

26  being "responsible."

Complaint                   5
FTC v. Volkswagen USA

1    24.    Volkswagen USA's "Clean Diesel" advertising included, among other things,

2    nationally-televised advertisements (including a Super Bowl ad), online social media campaigns

3    (including videos, websites and games on Facebook and elsewhere), press releases and public

4    statements, print advertising (including the slogan, "Diesel – It's No Longer A Dirty Word"),

5    posters, brochures and other materials distributed to dealers and independent distributors around

6    the country, collaboration with environmental nonprofits (including The Nature Conservancy),

7    and strategic product placement (for instance, Volkswagen USA arranged for actress Gwyneth

8    Paltrow to arrive at the Hollywood premiere of *Iron Man III* in an Audi "Clean Diesel").

9    25.    According to Volkswagen USA's marketing strategy materials, one of the "key

10   messages" it intended to convey through the word "clean" was that Clean Diesel vehicles

11   produce "NOx emissions [that are] reduced by 95 percent[.]"

12   **Volkswagen USA Claimed That Its Defeat Device Vehicles Had Low Emissions.**

13   26.    Volkswagen USA's advertisements, promotional materials, and public statements

14   represented that its Defeat Device Vehicles had low emissions, reduced NOx by 90%, had lower

15   NOx than comparable diesel vehicles, had lower emissions than comparable diesel vehicles, and

16   had lower emissions than comparable gasoline vehicles.  For example:

17   A.    A 2008 television advertisement, "Do Your Part," depicts people commuting in

18          different environmentally friendly ways: "trying to do their part" by taking the

19          bus, riding a Segway, biking, and driving a car with the bumper sticker "powered

20          by vegetable oil."  Then an Audi A3 speeds by, and the announcer observes:

21          "Some just have more fun doing it."  The screen reads:  "42mpg.  30% fewer

22          emissions."  The ad ends with the tagline:  "Diesel.  It's no longer a dirty word."

23   B.    A 2009 promotional mailer reads:  "With the new Jetta TDI Clean Diesel, you get

24          a great car that's low on emissions . . . ."  The mailer further claims that the car's

25          engine is "designed to reduce emissions," which is why it is "[c]lean as a

26          whistle."

1    C.    Press coverage of the 2008 "Audi Mileage Marathon," quotes an Audi

2          spokesperson saying:  "Diesel is not dirty.  This marathon is about getting the

3          word out that clean-diesel technology such as ours can achieve 40-percent better

4          fuel economy and reduce nitrogen-oxide emissions by 90%."

5    D.    A press release for the 2014 Volkswagen Touareg states that the "deNOx catalytic

6          converter . . . helps reduce NOx emissions by up to 90 per cent."

7    E.    According to 2010 press materials, the Volkswagen Jetta's clean diesel

8          technology "reduces nitrogen oxide (NOx) emissions by up to 90% by making

9          internal engine modifications and implementing a NOx storage catalytic

10         converter."

11   F.    A 2009 press release identifies the Audi Q7 as the "world's cleanest diesel SUV,"

12         states that it has an "advanced exhaust emission control system" that "reduces

13         smog-causing nitrogen oxides by up to 90% when compared with past generations

14         of diesel technologies sold in the U.S.," and is "significantly less intrusive on the

15         environment than past diesel engines."

16   G.    2013 emails to consumers promoting Audi TDIs state that "Clean Diesel" offers

17         "fewer NOx emissions than comparable gasoline engines."

18   H.    An Audi print ad with the tagline "Diesel.  It's no longer a dirty word," describes

19         the TDI engine as having "20% fewer emissions than gasoline engines."

20   I.    In the "coffee filter test" video featured on one of Volkswagen USA's online

21         media campaigns at TDITruthandDare.com, two testers compare a "Clean Diesel"

22         Volkswagen Touareg with a "traditional diesel" by placing clean white coffee

23         filters on the tailpipes "to see which one is cleaner after 10 minutes."  After the

24         "test," the Touareg filter is still clean white, but the "traditional diesel" filter had a

25         black stain.  The tester comments:  "That [filter from the "traditional diesel"] is

26         nasty-looking.  This [filter from the Touraeg] looks pretty good, though."  The

1   tester then proposes making coffee with the filters, commenting:  "Traditional

2   diesel coffee, it's got the extra kick.  It's got the carbon monoxide, the sulfur

3   oxide . . . . Ready for some sooty emissions, diesel particulates . . . ?"

4   J.   In a 2015 online video titled "Diesel Old Wives' Tale #6:  Diesel is Dirty," one of

5   the "old wives" asks:  "Aren't diesels dirty?"  The TDI driver (another "old wife")

6   responds:  "That used to be dirty; this is 2015."  She then "proves it" by holding a

7   white scarf to the exhaust of a Volkswagen Golf SportWagen TDI car and then

8   brandishing the clean cloth ("See how clean it is?").  The final tagline reads:

9   "Volkswagen TDI Clean Diesel:  Like really clean diesel."  This ad reached at

10   least 9 million consumers.

11   **Volkswagen USA Claimed Its Defeat Device Vehicles Complied**

12   **With Emissions Standards.**

13   27.   Volkswagen USA's advertisements, promotional materials, and public statements

14   represented that its Defeat Device Vehicles complied with state and federal emissions standards.

15   For example:

16   A.   "Clean Diesel" vehicles "meet the strictest EPA standards in the U.S."

17   B.   "Audi TDI clean diesel technology meets emission standards in all 50 states."

18   C.   Volkswagen USA presents the "50-state compliant clean diesel Volkswagen Jetta

19   TDI sedan and SportWagen TDI."

20   D.   The "Touareg V6 TDI meet[s] the most stringent emission requirements of the

21   world [with] its advanced DeNOx system."

22   E.   "To achieve its 50-state-legal emissions qualification, a deNOx catalytic

23   converter, augmented by a special injection system that sprays [diesel exhaust

24   fluid ("DEF")] into the exhaust, helps reduce NOx emissions by up to 90 per cent.

25   This lets the engine meet the Tier 2, Bin 5/ULEV II standards imposed across all

26   50 U.S. states."

1    F.    "Certified for use in all 50 states."

**Volkswagen USA Claimed that Its Defeat Device Vehicles**

**Were Environmentally Friendly.**

28.    Volkswagen USA's advertisements, promotional materials, and public statements represented that its Defeat Device Vehicles were environmentally friendly, including that they were "environmentally-conscious," "eco-conscious," or "green."  For example:

A.    In a television advertisement broadcast during the 2010 Super Bowl, the "Green Police" arrest consumers who use plastic bags or bottles, throw away batteries, fail to compost orange rinds, install incandescent light bulbs, soak in overheated Jacuzzi water, and drink from Styrofoam cups.  When an Audi driver encounters an "Eco Check" roadblock, a Green Police officer asks the driver: "You got a TDI here?"  The TDI driver responds:  "Clean Diesel."  An officer replies:  "You're good to go, sir."  The Audi driver speeds away and the screen goes black, displaying the tagline:  "Green has never felt so right."  The final tagline reads:  "Green Car of the Year.  Audi A3 TDI clean diesel."

B.    A press release states that the 2011 Audi Q7 "provides premium SUV buyers with a new level of environmental conscientiousness with its efficient 3.0 TDI clean diesel engine."

C.    A page titled "Our environment" in a 2014 Volkswagen Jetta brochure pictures a pristine river winding through lush green forest and states:  "Building cars comes with responsibilities—not just to you, but to the environment."  Under the caption "Our commitment to the environment," the brochure lists items such as "[e]ncouraging eco-conscious behavior."

D.    A press release for the launch of the 2009 Touareg TDI "Clean Diesel" states that the Touareg TDI "reinforces Volkswagen's commitment to clean diesel technology as the most sensible alternative fuel vehicle available today."

Complaint                                    9
FTC v. Volkswagen USA

1   E.  A 2013 brochure calls a TDI "Clean Diesel" vehicle "[g]ood, clean fun,"

2       compares it to a hybrid, and explains its "Think Blue" logo as:  "The sky's the

3       limit.  The color blue symbolizes our commitment to building environmentally

4       conscious cars . . . [a]nd setting a good example for eco-conscious behavior,

5       everywhere, and every day."  It concludes:  "Think Blue is the Volkswagen way

6       to drive progress by creating and producing cars that are more efficient, eco-

7       conscious, and fun to drive."

8   F.  A mailer to Volkswagen customers promotes the 2009 Jetta TDI with the heading,

9       "Hybrids?  They're so last year . . . ."  It further states:  "Now going green doesn't

10      have to *feel* like you're going green."

11   G.  Stickers on new "Clean Diesel" cars that disclose price, fuel economy, and other

12      features contain a Volkswagen USA motto:  "The People Want Good Clean

13      Diesel Fun."  According to Volkswagen USA's internal marketing materials, this

14      motto is "meant to convey that VW has the people, processes, [and] products to

15      provide sustainable solutions."

16 **Volkswagen USA Claimed Its Defeat Device Vehicles Would Retain a High Resale Value.**

17   29.  Through its advertising, public statements, and selling and leasing of cars,

18 Volkswagen USA also represented to consumers that its Defeat Device Vehicles were durable,

19 well-engineered vehicles that would retain a high resale value.  For example:

20   A.  Volkswagen USA promoted DDVs as a good investment that likely retains a high

21      resale value.  For example, in response to a hypothetical customer's desire for "a

22      return on my investment," a 2015 Audi brochure states:  "TDI® clean diesel

23      models typically have a higher resale value versus comparable gasoline vehicles."

24      Press releases and vehicle launches in 2009 cite "better resale value projections"

25      for the Audi Q7 and "phenomenal resale value" for the Volkswagen Touareg.

26

1      B.   In marketing the benefits of DDVs, Volkswagen USA often used its tagline:

2           "That's the power of German engineering," and referred to its "unparalleled" and

3           "superior" engineering.

4      C.   Volkswagen USA frequently described DDVs as "long-lasting."  As one brochure

5           states:  "Whether you're . . . driving mile after mile in any of our long-lasting TDI

6           models, Volkswagen is all about performance.  In fact, we're known for it . . . no

7           matter what model you choose, every Volkswagen is designed to perform.  Year

8           after year after year."

9      D.   In training dealers and distributors to sell and lease DDVs, Volkswagen USA

10          encouraged dealers to highlight the durability and high resale value of TDIs.

11          Training materials and fact sheets for dealers stress that TDIs have a higher resale

12          versus gasoline vehicles (noting a $3,800 resale difference at 48,000 miles and a

13          $3,000 difference at 60,000 miles) and that "[t]he durability of the 3.0-liter TDI

14          engine [ ] minimizes engine wear and tear over the life of the vehicle[,] which can

15          result in substantially higher resale than comparable competitive models with

16          gasoline engines."

17   **Volkswagen USA Continued to Deceptively Market Defeat Device Vehicles Despite**

18             **Evidence that the Vehicles Exceeded Legal Emissions Standards.**

19       30.    The International Council on Clean Transportation ("ICCT") hired West Virginia

20   University ("WVU") to conduct complex on-road testing (as opposed to government-mandated

21   laboratory testing) on several diesel light-duty vehicles.  In 2013, WVU began conducting on-

22   road testing in collaboration with the California Air Resources Board ("CARB").

23       31.    WVU performed this testing on a "Clean Diesel" Volkswagen Passat and a

24   "Clean Diesel" Volkswagen Jetta.  The "Clean Diesels" exceeded EPA's NOx limits by as much

25   as 4,000 percent.

26

Complaint                              11
FTC v. Volkswagen USA

1      32.     ICCT presented the results at a March 2014 conference attended by Volkswagen

2  engineers.  By mid-2014, CARB, EPA, and Volkswagen USA were communicating regularly

3  regarding possible causes of the excess emissions.  By October 2014, Volkswagen had

4  independently confirmed WVU's excess emissions findings, but provided regulators with

5  scientifically invalid explanations for why its vehicles emitted so much NOx.

6      33.     Volkswagen USA's interaction with CARB and EPA eventually led Volkswagen

7  USA to issue software repairs in late 2014, and a recall of 2.0L "Clean Diesel" vehicles in April

8  2015 to repair the emissions aftertreatment system.  One Volkswagen engineer discussing

9  proposed fixes noted that Volkswagen's 3.0L "Clean Diesel" vehicles have "exactly the same

10  issues, but not public yet."  He observed:  "They have not been caught."

11      34.     In coordination with EPA, CARB conducted both laboratory and on-road testing

12  on the 2.0L "Clean Diesel" vehicles after the fixes and recalls and discovered that they failed to

13  reduce the "Clean Diesel" vehicles' illegal NOx emissions.  The discrepancy between the Defeat

14  Device Vehicles' laboratory performance and their real-world performance remained.

15      35.     Volkswagen USA attempted to explain the discrepancy in various ways that

16  CARB and EPA found increasingly implausible.  Nonetheless, during this period, Volkswagen

17  USA continued to market "Clean Diesel" vehicles as producing low emissions, complying with

18  emissions standards, being environmentally friendly, and having a high resale value.

19      36.     In August 2015, EPA and CARB informed Volkswagen USA that it would not

20  receive COCs for 2016 model year 2.0L "Clean Diesel" vehicles until the issue was resolved.

21      37.     At this point, Volkswagen USA admitted that its 2.0L diesel vehicles contained

22  defeat devices.  On September 18, 2015, EPA issued Volkswagen USA a Notice of Violation

23  ("NOV") covering approximately 480,000 2.0L Defeat Device Vehicles.

24      38.     However, Volkswagen USA continued selling 3.0L "Clean Diesel" vehicles with

25  TDI engines that also contained defeat devices.

26

1    39.    On November 2, 2015, EPA issued a second NOV covering 3.0L "Clean Diesel"

2    vehicles.  EPA's second NOV explains that the 3.0L vehicles also contain defeat devices that

3    operate when testing occurs, and reduce NOx emissions to compliant levels only during the test.

4    Volkswagen USA admitted that these vehicles contain undisclosed software similar to the defeat

5    devices in the 2.0L vehicles.

6                          **VIOLATIONS OF THE FTC ACT**

7    40.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts

8    or practices in or affecting commerce."

9    41.    Misrepresentations or deceptive omissions of material fact constitute deceptive

10   acts or practices prohibited by Section 5(a) of the FTC Act.

11   42.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are

12   likely to cause substantial injury to consumers that consumers cannot reasonably avoid

13   themselves and that is not outweighed by countervailing benefits to consumers or competition.

14   15 U.S.C. § 45(n).

15                          **Count I:  Deceptive Representations**

16   43.    In numerous instances in connection with the advertising, marketing, offering for

17   sale, sale, offering for lease, lease, and distribution of Defeat Device Vehicles, Defendant

18   represented, directly or indirectly, expressly or by implication:

19          A.    That Defeat Device Vehicles have low emissions, including that they

20   reduce NOx by 90%, have lower NOx than comparable diesel vehicles, have lower emissions

21   than comparable diesel vehicles, and have lower emissions than comparable gasoline vehicles;

22          B.    That Defeat Device Vehicles meet basic emissions standards, including

23   that DDVs satisfied federal and state standards for emissions compliance;

24          C.    That Defeat Device Vehicles are environmentally friendly, including that

25   they were "environmentally-conscious," "eco-conscious," or "green"; and

26

Complaint                                    13
FTC v. Volkswagen USA

1        D.      That Defeat Device Vehicles would not suffer a significant reduction in

2   their resale value compared with similar vehicles, including that their resale value would be

3   "higher . . . versus comparable gasoline vehicles."

4        44.     In truth and in fact:

5        A.      Defeat Device Vehicles do not have low emissions, do not reduce NOx by

6   90%, do not have lower NOx than comparable diesel vehicles, do not have lower emissions than

7   comparable diesel vehicles, and do not have lower emissions than comparable gasoline vehicles;

8        B.      Defeat Device Vehicles do not meet basic emissions standards, including

9   federal and state standards for emissions compliance;

10       C.      Defeat Device Vehicles are not environmentally friendly, not

11  "environmentally-conscious," not "eco-conscious," and not "green"; and

12       D.      Defeat Device Vehicles will suffer a significant reduction in their resale

13  value compared with similar vehicles because they contain defeat devices.

14       45.     Therefore, Defendant's representations as set forth in Paragraph 43 of this

15  Complaint are false and misleading and constitute a deceptive act or practice, in violation of

16  Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

17                      **Count II:  Deceptive Failure to Disclose**

18       46.     In numerous instances in connection with the advertising, marketing, offering for

19  sale, sale, offering for lease, lease, and distribution of Defeat Device Vehicles, Defendant

20  represented, directly or indirectly, expressly or by implication, that DDVs were durable, well-

21  engineered vehicles.

22       47.     In numerous instances in which Defendant has made the representations set forth

23  in Paragraph 46 of this Complaint, Defendant failed to disclose that DDVs contain defeat devices

24  that adversely affect the resale value of the DDVs.

25       48.     The additional information described in Paragraph 47 of this Complaint would be

26  material to consumers in deciding whether, or at what price, to purchase DDVs.

49.     Defendant's failure to disclose the material information described in Paragraph 47, in light of the representations in Paragraph 46, constitutes a deceptive act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. 45(a).

### Count III:  Means and Instrumentalities

50.     Defendant Volkswagen USA has distributed advertisements and promotional materials, including but not limited to videos, webpages, brochures, posters, stickers, and point of sale materials containing the representations described in Paragraph 43 to dealers and independent distributors that sold, leased, and distributed Defeat Device Vehicles.  In doing so, Defendant provided dealers and distributors with the means and instrumentalities for the commission of deceptive acts or practices.

51.     Defendant's practices as set forth in Paragraph 50 of this Complaint constitute a deceptive act or practice, in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count IV:  Unfairness

52.     As described in Paragraphs 19-21 of this Complaint, Defendant Volkswagen USA's Defeat Device Vehicles contained defeat devices.  Defendant then advertised, marketed, offered for sale, sold, offered for lease, leased, and distributed these vehicles to consumers, as described in Paragraphs 22-39 of this Complaint.

53.     Defendant's actions caused or are likely to cause substantial injury to consumers, including that consumers unknowingly purchased or leased vehicles that, when driven on roads, exceed legal emission standards, emit high levels of NOx and, as a result, have a substantially reduced value.  Because of Defendant's actions, consumers purchased or leased substantially different vehicles than the ones they thought they purchased and did not receive the benefit of their bargain.  Collectively, these consumers suffered billions of dollars in injury.

1      54.     Consumers could not have reasonably avoided this substantial injury because they

2   could not reasonably have known the Defeat Device Vehicles contained a defeat device before

3   they purchased or leased the vehicle.

4      55.     The substantial injury suffered by consumers is not outweighed by countervailing

5   benefits to consumers or competition.  Because defeat devices are illegal, they produce no legally

6   cognizable benefit to consumers.  Additionally, any alleged benefit the defeat devices delivered

7   to consumers is vastly outweighed by the billions in injury consumers suffered.  Furthermore, the

8   use of a defeat device disadvantaged auto manufacturers that did not employ illegal software.

9      56.     Therefore, Defendant's practices as described in Paragraph 52 of this Complaint

10   constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a)

11   and 45(n).

12                                    **CONSUMER INJURY**

13      57.     Consumers have suffered and will continue to suffer substantial injury as a result

14   of Defendant Volkswagen USA's violations of the FTC Act.  In addition, Defendant has been

15   unjustly enriched as a result of its unlawful acts or practices.  Absent injunctive relief by this

16   Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the

17   public interest.

18                        **THIS COURT'S POWER TO GRANT RELIEF**

19      58.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant

20   injunctive and such other relief as the Court may deem appropriate to halt and redress violations

21   of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable

22   jurisdiction, may award ancillary relief, including rescission or reformation of contracts,

23   restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and

24   remedy any violation of any provision of law enforced by the FTC.

25

26

Complaint                                        16
FTC v. Volkswagen USA

**PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.   Enter a permanent injunction to prevent future violations of the FTC Act by Defendant;

B.   Award such additional relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

C.   Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

Dated: 3/29/16

JONATHAN COHEN
MICHELLE L. SCHAEFER
AMANDA B. KOSTNER
SANGJOON "SIMON" HAN
MEGAN A. BARTLEY

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

Complaint
FTC v. Volkswagen USA

17